UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**TYLER GENE NICKEL**,

        Plaintiff,

v.

**CAROLYN W. COLVIN, Acting Commissioner of Social Security**,

        Defendant.

Case No. 6:15-cv-01798-KI

OPINION AND ORDER

    Kathryn Tassinari
    Mark A. Manning
    Harder, Wells, Baron & Manning, P.C.
    474 Willamette, Suite 200
    Eugene, OR 97401

        Attorneys for Plaintiff

    Billy J. Williams
    United States Attorney
    District of Oregon
    Janice E. Hebert
    Assistant United States Attorney
    1000 SW Third Ave., Suite 600
    Portland, OR 97204-2902

Lisa Goldoftas
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Suite 2900 M/S 221A
Seattle, WA 98104-7075

    Attorneys for Defendant

KING, Judge:

Plaintiff Tyler Gene Nickel brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB"). I affirm the decision of the Commissioner.

## BACKGROUND

Nickel filed an application for DIB on March 13, 2014, alleging disability as of September 26, 2011. The application was denied initially and upon reconsideration. After a timely request for a hearing, Nickel, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on March 11, 2015.

On April 10, 2015, the ALJ issued a decision finding Nickel not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on July 29, 2015.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or

mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months.  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability.  The evaluation is carried out by the ALJ.  The claimant has the burden of proof on the first four steps.  *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920.  First, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b) and 416.920(b).  If the claimant is engaged in such activity, disability benefits are denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

PAGE 3 - OPINION AND ORDER

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. *Parra*, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's

findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

The ALJ identified left shoulder axillary nerve injury from a gunshot wound with nerve neurolysis, post-traumatic stress disorder ("PTSD"), and depression as Nickel's severe impairments. The ALJ found these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ concluded Nickel retains the residual functional capacity ("RFC") to perform less than light work. Specifically, Nickel should never crawl or climb ladders, ropes or scaffolds. He is limited to no more than occasional reaching in any direction with his left upper extremity. He is limited to occupations requiring no more than occasional interaction with supervisors, co-workers and the general public. He would work best in an independent work environment involving minimal supervision and minimal interruption. Given this RFC, the ALJ concluded Nickel could not perform his past relevant work, but could perform other work such as an ironer, bakery line worker, and scaling machine operator. As a result, the ALJ concluded Nickel was not disabled.

## FACTS

Nickel, at 21 years old on his alleged disability onset date, has a high school degree and some college. He served for four years in the U.S. Marine Corps. His alleged onset date of disability– September 26, 2011–is the date on which he sustained a self-inflicted gunshot wound to his shoulder during a failed suicide attempt. He underwent several surgeries, continued to perform office work for the Marine Corps, underwent a final surgery in April 2012, and was

PAGE 5 - OPINION AND ORDER

honorably discharged in June 2012.  After Nickel complained of weakness, stiffness and pain at a level of 2/10 in August 2012, his shoulder was assessed for physical therapy.  He reported slow movements for personal care, an inability to participate in any sports activities, and an inability to reach above waist level without feeling symptoms.  After undergoing a course of physical therapy in August and September 2012, he was discharged with no improvement.

Nickel also established psychiatric care at the VA, with Susan Aviotti, LPC, in August 2012.  He told Aviotti he was living with his girlfriend, his sister, her boyfriend, and their baby.  He could concentrate and focus for about an hour, he reported low energy, his voice was low but articulate, motor activity was normal, and his judgment was pretty good.  He reported intrusive recollections of combat, felt detached from everyone except his girlfriend, and felt irritable and angry.  He planned to start school in the fall.  Aviotti diagnosed Nickel with PTSD, Major Depressive Disorder, and Personality Disorders.

Nickel began attending group therapy sessions in January 2013, which continued into January 2015.  He reported that anger caused him to punch a hole in the wall; he never fought with people.  He reported feeling excited about a metal detector purchase, and sharing that activity with his girlfriend.  He expressed surprise at his initial VA disability rating of 90% in February 2013; Aviotti described Nickel as "an avid group member, not always verbally participating a lot, but surely interested in what others say."  Tr. 494.  In a one-on-one session with Aviotti a week later, Nickel reported concerns about school and thoughts of dropping out.  He worried unemployability would take away any sense of accomplishment in his life.  Aviotti described him as a "[v]ery aware young man who seeks help with things he knows he needs help with."  Tr. 493.  He went to Disneyland with his girlfriend in March to celebrate their

anniversary. He had fun, but the crowds made him angry. If he went again he would get a quick-pass to avoid standing in lines.

Nickel referred himself to a PTSD residential rehabilitation program in April 2013, where he sought treatment for his numbed emotions, and difficulties with anger and rage. He had previously been prescribed Celexa, before his suicide attempt, which he did not like, and he had subsequently "never really talked to the right people about meds, and I have been kind of apprehensive to try any other ones." Tr. 347. He reported not participating in any activities; he liked to hike and camp, but he had not been doing anything lately due to lack of energy. Nickel participated in five psycho educational classes a week for almost six weeks, daily group therapy, weekly counseling, and leisure activities. He was on time to all scheduled activities and group sessions and participated to the best of his ability. He reported "some" progress, but not what he had expected. Tr. 419. He ended up leaving a little early, criticizing the program as a "joke[.]" Tr. 421-22.

After returning home, Nickel continued his group therapy sessions. He reported that he and his girlfriend had bought a home together and were working on improvements to obtain a loan. Aviotti thought he looked more relaxed and less stressed. During a one-on-one in June, Aviotti learned Nickel was having trouble containing his anger; he had broken a fishing pole after throwing a fit the previous day. Aviotti noted that Nickel "has really grown a lot since he's been coming here [and] needs to recognize the positive things in his life." Tr. 492. Nickel missed about a month and a half of sessions while he settled into his new home; he returned on July 2013 and spent time venting about unfair treatment of Marines. At the next several sessions, Nickel talked about his new dog and "sounded so happy." Tr. 491. The only problem was that

he "says he has nothing to do. He is looking at having a lifetime of no[t] being able to work [and] doesn't know which way to go." Tr. 491. He proposed to his girlfriend in August, and they planned to go camping, he "even has a shower rigged up for the girls," and he reported feeling bored. Tr. 490. He fell off a small scooter in September and he went flying. He scraped his whole arm on the side of the road.

Nickel underwent a VA compensation exam on September 18, 2013. Mical Dutson, NP, examined Nickel's left shoulder and arm. He diagnosed diminished sensation in the left arm and a failed attempted nerve graft. Dutson noted moderate paresthesis and/or dysesthesias, and moderate numbness. Nickel's flexion and extension were normal in the elbow and wrist, but he had muscle atrophy of two centimeters on the left side. He displayed normal deep tendon reflexes in the biceps, triceps, and brachioradialis, but decreased sensation in the shoulder, inner/outer forearm, hand/fingers, and ulnar distribution to long, ring, and middle fingers. Dutson opined that the peripheral neuropathy would affect Nickel's ability to work in that repetitive lifting tasks, or even left shoulder and arm movements, would be unsafe and problematic. Tr. 360.

John Gardin, Ph.D., evaluated Nickel's PTSD and depression the same day. Dr. Gardin commented that although Nickel was able to attend and perform well in his first community college term, he then failed all his courses in the second term as a result of memory issues and anxiety. Dr. Gardin opined that Nickel had total occupational and social impairment as a result of his PTSD and depression. Dr. Gardin pointed to Nickel's avoidance, nightmares, irritability, and insomnia, loss of interest in life activities, hypervigilance, and emotional distancing. Nickel reported having no friends, avoiding activities outside of the house, angry outbursts at home and

in public, and panic attacks in public. Dr. Gardin thought Nickel would be unable to seek or maintain employment, and that no accommodation could change his opinion since Nickel's attention, concentration, and memory problems were significant. Tr. 375.

The VA awarded Nickel 100% disability.

Nickel reported in his group sessions that he had started attending events with the Point Man Ministries, and he reported planning on going hunting in late September. He expressed an interest in becoming more active, and in reading a book, as his New Year's resolutions. He reported that he and his girlfriend were going to be married early so she could take advantage of the GI bill, and he invited everyone to a restaurant to celebrate afterward.

Nickel sought care for his shoulder in October 2013. He reported not gaining any strength the past nine months, and an inability to abduct his left arm beyond 45 degrees; his hand seemed weak and less dextrous. Running for prolonged periods caused pain. He had some cramping in his arm after activity. He agreed to try gabapentin, he declined occupational therapy as he felt he was able to manage his activities of daily living, and he was referred to plastic surgery for additional surgical options.

By January 2014, Nickel reported finding himself getting less angry and he was successfully using anger management techniques. The next month, he sought a one-on-one with Aviotti to discuss his anger, at his wife's request. Later that month, he reported to the group that he was making a laundry chute for the house. He was going shooting for fun, and he started swimming again.

The plastic surgeon evaluated Nickel's arm, and noticed Nickel "relegated that arm to little more than a holder or helper." Tr. 464. His elbow was normal, but his wrist and fingers were weak. The surgeon recommended a referral to the Mayo Clinic.

In the meantime, Nickel continued to attend group sessions. He was all smiles after his marriage, and traveled to North Carolina in April 2014. He seemed depressed in May, reporting trouble getting motivated each day. He went to the VA two days later; he had stopped the gabapentin as it caused nightmares. His provider urged exercise, perhaps wrapping his arm in a sling to avoid injury.

Nickel told the group in May about a three-week trip to North Carolina he took with his wife. He realized he still needed to attend the group sessions when he had an altercation with a homeless man on the street who was taunting his wife. He "[s]aid he is still upset with himself but also more aware of the anger underneath." Tr. 482.

In June, Nickel reported to the group that he was happy about a new security system, he was in better spirits, and had a camping trip planned. The camping trip was successful, except for mosquitos. He reported in July that he and his wife were buying a trailer and they were excited to use a rubber raft. He sought a one-on-one appointment a week later to discuss his angry outbursts. He continued to volunteer, plan more camping trips, and seemed less anxious.

Nickel went to the Mayo Clinic in October 2014. He was told that a nerve graft was impossible, but that he could talk to an orthopedic surgeon. He was told that he "had reinnervation of most of his muscles, and all of his muscles had some activation except his infraspinatus, and that was actually good news, and that he actually had reasonable function in the arm, and so one would not want to jeopardize that." Tr. 517.

When he returned, Nickel informed the group that the prognosis was not good and he decided he would not have surgery. He was volunteering quite a bit. He and his wife were planning a trip to Florida and a second wedding. He and his wife had also spearheaded a new support group for veterans. He was attending church.

When Nickel returned to his care provider at the VA, he reported that the shoulder surgery was too risky with minimal change of improvement to functioning. He felt he could now move forward. Aviotti commented that the group had formed a pretty tight friendship.

Carolyn Billman, CADC III, completed a mental residual functional capacity form for Nickel in January 2015. Tr. 508.

In February 2015, Nickel complained of pain in his left hand, and cramping in his thumb, especially while lying on his left arm, or when lifting more than 10 pounds. He described slight weakness in his hand. Tr. 551.

## DISCUSSION

Nickel challenges the ALJ's decision on the following grounds: the ALJ's failure to credit his testimony; the ALJ's failure to give great weight to the VA's disability rating; and the ALJ's rejection of the lay witness' testimony.

I.     Nickel's Credibility

Nickel testified initially that he could "perform basic motor functions, grasp bags of groceries, what have you" now, and that he felt his PTSD was the biggest hindrance to employment. Tr. 50. He later testified that he could not reach out at all with his left arm. Tr. 55. He had felt nervous at school, and had signed himself into the inpatient treatment program for his PTSD. Nickel testified that the VA paid his wife to act as his caregiver, that she took classes

PAGE 11 - OPINION AND ORDER

online from home, and that she did most of the cooking and chores. He could do the laundry. He could drive to church, therapy, and the grocery store. He initially testified that he spent his time woodworking, target practicing, and fishing, but later clarified that he had not tried woodworking since the accident, and that he cast his fishing line with one hand and lay prone on the ground to shoot. He described feeling unable to tolerate stress, and overreacting in a physical, self-destructive way.

The ALJ found Nickel's testimony not entirely credible for several reasons. First, the ALJ pointed out Nickel testified that his left shoulder was not his primary problem, but that he only knew and was trained for physical work which he felt he could no longer perform. Tr. 23. In fact, his activities suggested that any numbness or gripping difficulties had not interfered with his ability to camp, drive long distances, ride a scooter, metal detect, golf, fish, hunt, paddle a river raft, woodwork, try stained glass work, and other activities. In any event, the ALJ eliminated work requiring crawling or climbing ladders, ropes, or scaffolds, as well as work with more than occasional reaching.

Additionally, with respect to Nickel's testimony about his anger, the ALJ noted Nickel permitted others to live in his home (including his sister, her boyfriend, and their baby and, at other times, Nickel's father) without causing him discomfort. Nickel had no trouble driving to Salem, Portland, North Bend, and other parts of Oregon, and flew to Disneyland, North Carolina, Florida, and Minneapolis. In addition, the ALJ wondered about Nickel's decision not to try psychotropic medications to reduce his anxiety, panic, and depression.[1]

---

[1] The Commissioner points to additional comments the ALJ made about Nickel's work history beyond his alleged disability onset date, the circumstances surrounding the self-inflicted
(continued...)

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. *Id.* The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. *Id.* "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).[2]

Daily activities could be relevant for one of two purposes. A claimant's daily activities might be so substantial such that they equate to an ability to work. *Orn v. Astrue*, 495 F.3d 625,

---

[1](...continued)
gunshot wound, and evidence of secondary gain. The ALJ did not state these factors in a way that I would consider "specific" to his credibility analysis, and I do not consider them.

[2]The Commissioner suggests the clear and convincing standard need not control the analysis, encouraging application of the more deferential regulatory requirement for specific reasons supported by substantial evidence. Def.'s Br. 13, n.26. The Ninth Circuit has rejected her argument. *See Burrell v. Colvin*, 775 F.3d 1133 (9th Cir. 2014) (reasserting that the ALJ must provide "specific, clear and convincing reasons" to support a credibility analysis).

PAGE 13 - OPINION AND ORDER

639 (9th Cir. 2007).  Alternatively, the activities might be inconsistent with testimony purporting to be limited in some way.  *Id.*  Frankly, the extent of Nickel's activities supports the ALJ's conclusion.  Nickel focuses on his angry outbursts, and his comfort-level with other veterans who understood his circumstances.  The ALJ noted contradictory facts–such as Nickel's ability to drive, travel long distances through crowded airports (notably he indicated he would return to Disneyland despite the crowds), and offer his home to family members without any evidence of conflict or frustration.  Further, the ALJ limited Nickel to only occasional interaction with supervisors, co-workers, and the general public, and work requiring minimal supervision and minimal interruption.  Although Nickel's interpretation of the record is rational, the ALJ's reading of the record is "supported by inferences reasonably drawn from the record[.]"  *Molina*, 674 F.3d at 1110.

Additionally, while the ALJ must proceed cautiously in questioning a claimant's failure to seek psychiatric treatment for a mental condition, *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996), here Nickel was attending group sessions, had admitted himself into a PSTD inpatient treatment program, and recognized his anger and depression problems.  Nickel points out that no doctor *prescribed* such medication, at least in the later years.  In March 2012, Nickel was advised to take anxiety medications as needed and he was given a pamphlet about medications in May 2013.  Tr. 208, 439.  Thus the evidence demonstrates Nickel knew about the availability and benefits of such medication and that his decision not to seek anti-depressants or other psychotropic medications may suggest his symptoms were not severe enough to motivate him to seek that kind of treatment.  *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (it "is powerful

evidence regarding the extent" of the symptom if the claimant is not motivated to seek other forms of treatment).

In sum, the ALJ did not err.

II.     The VA's Disability Rating

The VA assigned a 100% disability rating to Nickel.  A VA disability rating is entitled to great evidentiary weight in a Social Security proceeding.  *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002).  Since the VA and SSA criteria for determining disability are not identical, an ALJ may give less weight to a VA rating decision by giving persuasive, specific, and valid reasons for doing so that are supported by the record.  *Id.*  The ALJ rejected the VA disability rating, stating, "[U]nfortunately, the VA has its own set of criteria for determining disability benefits, and those criteria are different from the Social Security regulations."  Tr. 27. This reason alone is insufficient.  *See McCartey*, 298 F.3d at 1076 (commenting on the "marked similarity between these two federal disability programs").

The ALJ, however, also discussed Nickel's lower number of anger management issues since the VA's decision, and questioned the VA rating based on evidence the VA did not have at the time of the rating decision.  Nickel contends he continued to have anger management issues, but in a group session in January 2014, he himself commented he found himself "getting angry fewer and fewer times."  Tr. 485.  He also continued to register awareness about his anger management issues.  Tr. 482.  The ALJ's conclusion was based on substantial evidence in the record.  *Molina*, 674 F.3d at 1110 (holding substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance).

PAGE 15 - OPINION AND ORDER

Regarding the timing of the VA determinations, and what evidence the agency had available, the ALJ commented that Nickel attended the inpatient treatment program "just prior to his next C&P psychological evaluation to increase his disability rating" from the VA. Tr. 24. There is no indication in the record as to what evidence the VA considered in issuing its unemployability determination effective January 2014. Tr. 161-62. The VA rating decision issued in June 2013 relied on the opinions of Dr. Gardin, Dutson, and Billman, all of which the ALJ found unpersuasive. Instead, the ALJ relied on the State agency medical and psychological consultants' opinions, which in turn were based on all of the VA records, in concluding the VA's rating decision was not entitled to any weight.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician. More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark*, 454 F.3d at 1066 n.2.

A.  Dr. Gardin

The ALJ commented that the extent of the limitations identified by Dr. Gardin in Nickel's evaluation were inconsistent with Nickel's level of activity.  Although Nickel disputes that his ability to participate in group therapy for veterans and his church activities indicate he is able to function in a work setting, the ALJ supported his finding of only moderate social difficulties as follows, "claimant had friends that came over and played videogames. . . . In his PTSD group therapy sessions, the claimant has reported ability to start a relationship with his current wife, plan and arrange multiple weddings, go fishing, go camping, travel by car, travel by airplane to Disneyland for vacation, go to the shooting range to shoot guns, eat at restaurants, attend church weekly, among several other activities."  Tr. 19; *see also* Tr. 24-25 (detailing maintaining a relationship, buying a house, helping family members, plans to marry, and intentions to obtain 100% disability rating).  Dr. Gardin, to the contrary, found Nickel had such significant symptoms–such as depression and intense anxiety–that no amount of accommodation would give Nickel the ability to work.  The ALJ's conclusion that Dr. Gardin's opinion–which included a discussion of Nickel's anxiety around others, lack of friends, and lack of motivation–was inconsistent with other evidence in the record is a specific and legitimate reason supported by substantial evidence in the record.  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (holding ALJ is not required to accept the opinion of a physician that is "unsupported by the record as a whole").

B.  Dutson and Billman

Dutson and Billman are considered among the "other sources" listed in the Social Security regulations who are not acceptable medical sources.  *See* 20 C.F.R. § 416.913(d)(1)-(4).

The ALJ may reject the opinions of such sources by giving reasons that are "germane" to that source. *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 (9th Cir. 2010).

The ALJ gave no weight to Billman's opinion because it was not corroborated by her notes from the group sessions she co-organized with Aviotti. Specifically, Billman identified marked limitations in Nickel's ability to carry out very short and simple instructions; ability to understand, remember and carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to ask simple questions or request assistance; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; ability to respond appropriately to changes in the work setting; and ability to set realistic goals or to make plans independently of others. These marked limitations were simply not apparent in Nickel's testimony, in the chart notes, or in Nickel's performance during group sessions. These are all germane reasons to weigh Billman's opinion less than other opinions. *Britton v. Colvin*, 787 F.3d 1011, 1013 (9th Cir. 2015) (holding that a germane reason to reject nurse practitioner's opinion was that it conflicted with claimant's daily activities).

With respect to Dutson, the ALJ described the examination in detail, including the normal motor strength, normal deep tendon reflexes, some left shoulder weakness, fatigue and in-coordination (but no pain), and commented that Nickel had injured himself the day before the examination when he fell off his scooter. Tr. 22. The ALJ also noted Nickel's own testimony

that any limitation with his left upper extremity was not his primary issue. The ALJ opined as to Nickel's postural limitations in creating the RFC. The ALJ adequately addressed Dutson's opinion.

III.    Lay Witness Testimony

Nickel's wife, Megan Clyburn, prepared a written report describing Nickel's activities and behavior. In it, she wrote Nickel could not move his right shoulder or lift much with his left arm. She said Nickel had to pick up his left arm with his right hand if he wanted to move it. She wrote that Nickel's PTSD caused him to be forgetful, angry, and antisocial. Nickel cooked meals, could perform light cleaning, laundry, and shopping. He played video games, sometimes with a visiting friend, and watched television. The ALJ found this report to be inconsistent with the evidence.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006). Here, just as in his analysis of Dr. Gardin's opinion, and the opinions of Dutson and Billman, the ALJ properly questioned the validity of Clyburn's report when Nickel himself reported that his arm was not his primary issue, and when Nickel's high level of activity contradicted Clyburn's observations. Specifically, Nickel could travel, hang out with friends, ride a scooter, go to church, group therapy, and volunteer, metal detect, golf, fish, hunt, and paddle a river raft. The ALJ gave a germane reason to question Clyburn's report.

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards. For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this      10th      day of January, 2017.

      /s/ Garr M. King
     Garr M. King
     United States District Judge